## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

————————————

### UNITED STATES OF AMERICA,

*Plaintiff/appellee,*

v.

### JOFF STENN WROY PHILOSSAINT,

*Defendant/appellant.*

————————————

**On Appeal from the United States District Court
for the Southern District of Florida**

————————————

**INITIAL BRIEF OF THE APPELLANT
JOFF STENN WROY PHILOSSAINT**

————————————

SCOTT W. SAKIN, P.A.
CJA Counsel for Appellant
JOFF STENN WROY PHILOSSAINT
2883 Executive Park Drive, Ste 200
Weston, Florida 33331
E-mail: scott@sakinlaw.com
Telephone No. (954) 779-7879

**THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL APPEAL)**

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

### United States of America v. Joff Stenn Wroy Philossaint
### Case No. 23-12273-A

Appellant, Joff Stenn Wroy Philossaint, files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Adler, Robert E.

Finney, Jr., Linnes

Gayle, Brianna Monique

Goldstein, Ian Jeremy

Gonzalez, Juan Antonio

Johnson, David Andre

Lacosta, Anthony W.

Lapointe, Markenzy

Lauvince, Robinson

Matthewman, Hon. William

Matzkin, Daniel

Maynard, Hon. Shaniek

McCabe, Hon. Ryon M.

McCray, Jr., Jonny Leonard

Michelen, Juan

Osborne, Marc

Osborne, Susan

Paster, Joshua

Philossaint, Joff Stenn Wroy

Rabin, Jr., Samuel Joseph

Ralston, Brian

Reinhart, Hon. Bruce E.

Rene, Regine Marie

Sakin, Scott William

Salnick, Gregory Steven

Schiller, Gregory

Shazier, Maurice

Small Business Administration (SBA)

Smith, Hon. Rodney

Sweetapple, Sarah Elizabeth

Timberlake-Wiley, Deana L.

Tollinchi, Mariel

Tucker, David Kalman

Valle, Hon. Alicia O.

Villafana, Ann Marie C.

Wasserman, Jonathan Harry

Weinstein, Michael David

Weiss, Jason Samuel

White, Charles Garret

Wilcox, Daryl Elliott

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully submits that oral argument is necessary to the just resolution of this appeal and will significantly enhance the decision-making process.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ....................................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CITATIONS .......................................................... iii

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ................................................................ v

STATEMENT OF THE ISSUES ............................................... 1

STATEMENT OF THE CASE ................................................. 2

Statement of Facts, Course of Proceedings and Disposition in the District Court ..................................................... 2

Standards of Review ..................................................... 21

SUMMARY OF THE ARGUMENTS ....................................... 22

ARGUMENTS AND CITATIONS OF AUTHORITY ........................... 23

I.   The forfeiture money judgment entered against Mr. Philossaint must be vacated because the district court clearly erred when it adopted the government's miscalculation as the approximate amount of money subject to forfeiture ..................................................... 23

     A.   Forfeiture background ......................................... 23

     B.   The approximate amount of money subject to forfeiture against Mr. Philossaint is $549,226.30 ................................. 25

CONCLUSION ................................................................ 28

CERTIFICATE OF COMPLIANCE ............................................ 29

CERTIFICATE OF SERVICE ................................................. 30

# TABLE OF CITATIONS

**Cases**

*\*United States v. Gladden,*

    78 F.4th 1232 (11th Cir. 2023) ............................................................21

*\*United States v. Hasson,*

    333 F.3d 1264 (11th Cir. 2003) ...........................................................24

*\*United States v. Hoffman-Vaile,*

    568 F.3d 1335 (11th Cir. 2009) ....................................................22, 26

*United States v. Joseph,*

    743 F.3d 1350 (11th Cir. 2014) ...........................................................23

*United States v. Moss,*

    34 F.4th 1176 (11th Cir. 2022) ............................................................23

*United States v. Treacy,*

    639 F.3d 32 (2d Cir. 2011) ...........................................................25, 27

**Statutes, Rules, and Constitutional Provisions**

18 U.S.C. § 982(a) .......................................................................................24

18 U.S.C. § 982(a)(1) ...................................................................................24

18 U.S.C. § 982(a)(2) ...................................................................................24

18 U.S.C. § 1349 ...........................................................................................2

18 U.S.C. § 1425(a) ........................................................................ 2

18 U.S.C. § 1956 .......................................................................... 23

18 U.S.C. § 1956(h) ...................................................................... 2

18 U.S.C. § 3231 .......................................................................... v

18 U.S.C. § 3553(a) ...................................................................... 19

18 U.S.C. § 3742 .......................................................................... v

28 U.S.C. § 1291 .......................................................................... v

Fed. R. Crim. P. 32.2(b)(1)(A) ..................................................... 24

Fed. R. Crim. P. 32.2(b)(1)(B) ................................................ 24, 25

Fed. R. Crim. P. 32.2(b)(2)(A) ..................................................... 24

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The district court had jurisdiction of this case pursuant to 18 U.S.C. § 3231 because the appellant was charged with an offense against the law of the United States. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, which give the courts of appeals jurisdiction over all final decisions and sentences of the district courts of the United States.

The notice of appeal was timely filed on July 10, 2023 (DE 324), from the Preliminary Order of Forfeiture entered on June 26, 2023 (DE 312), and the final judgment of the district court entered on June 27, 2023 (DE 314), that disposes of all claims between the parties to this cause.

# STATEMENT OF THE ISSUES

**Whether the forfeiture money judgment entered against Mr. Philossaint in the amount of $673,210.934[1] must be vacated because the district court clearly erred in adopting the government's miscalculated sum as the forfeiture amount.**

---

[1] The Preliminary Order of Forfeiture (DE 312), states that the forfeiture money judgment is in the amount of $673,210.934. This is clearly a typo. For purposes of this Brief, the amount will be rounded as follows: $673,210.93.

## STATEMENT OF THE CASE AND FACTS

The appellant was the defendant in the district court and will be referred to by name. The appellee, United States of America, will be referred to as the government. The record will be noted by reference to the document entry number ("DE"), followed by the page number, of the record on appeal.

Mr. Philossaint is incarcerated.

### Course of Proceedings and Disposition in the District Court

On September 8, 2022, Joff Stenn Wroy Philossaint was named in an indictment with three co-defendants and other co-conspirators. (DE 32). Mr. Philossaint was charged with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349 (Count 1), two counts of Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h) (Counts 2 and 3) and Obtaining Citizenship by Fraud, in violation of 18 U.S.C. § 1425(a) (Count 4). (DE 32).

The indictment alleged that beginning in or around April 2020 and continuing through about August 2022, Mr. Philossaint and his co-defendants/co-conspirators willfully conspired and devised a scheme to defraud and obtain money from the Paycheck Protection Program

("PPP") and Economic Injury Disaster Loan ("EIDL") program. (DE 32:6-7). The Coronavirus Aid, Relief, and Economic Security ("CARES") Act enacted in March of 2020, authorized forgivable loans to small businesses suffering from economic effects caused by the COVID-19 pandemic through the PPP program, and additionally authorized the Small Business Administration ("SBA") to provide EIDL assistance to eligible small businesses experiencing substantial economic injury due to the pandemic. (DE 32:1-3). The indictment alleged the purpose of the conspiracy was for the defendants and their co-conspirators to unlawfully enrich themselves, and that they accomplished this by, among other things:

> (1) creating false and fraudulent documents, including payroll records and tax documents; (2) submitting and causing the submission of false and fraudulent applications for loans made available through the SBA to provide relief for the economic effects caused by the COVID-19 pandemic, including EIDL and PPP loans; (3) offering, paying, and receiving kickbacks in return for causing the submission of false and fraudulent loan applications; (4) diverting fraud proceeds for the Defendants' and co-conspirators' personal use and benefit, the use and benefit of others, and to further the conspiracy; and (5) submitting and causing the submission of false and fraudulent applications for forgiveness of the received loans.

(DE 32:7). Specifically, the indictment alleged that Mr. Philossaint and one of his co-defendant's, Brianna Monique Gayle, created false and fraudulent tax documents for business entities owned and controlled by them[2] and their co-defendants/co-conspirators for the purpose of applying for PPP and EIDL loans. (DE 32:7). The loan applications that were submitted, or that were caused to be submitted, by Mr. Philossaint and his co-defendants/co-conspirators fraudulently represented the number of employees, amount of monthly payroll, gross income, and costs of goods sold for these business entities. (DE 32:8). Mr. Philossaint and Ms. Gayle also caused the creation of fraudulent payroll accounts, with a payroll processing service, to aid them in the application for, and forgiveness of, the PPP and EIDL loans. (DE 32:8).

Per the indictment, after PPP and EIDL loans were obtained for the business entities of the defendants and co-conspirators, a portion of the

---

[2] Mr. Philossaint was the principal and registered agent of Royal Elite Trans, LLC ("Royal Elite"), Elite International Financial Group, a/k/a Elite International Venture Capital ("EIVC") and One Solution Group, LLC, purported businesses located in Broward County, in the Southern District of Florida. (DE 32:4-5)

Mr. Philossaint also was the president of Dad Money Investment Group, LLC. (DE 32:5).

loan proceeds were transferred to the payroll processing services to make it appear as if the proceeds were being used for legitimate payroll expenses. (DE 32:8). In exchange for obtaining PPP and EIDL loans for his co-defendants' and co-conspirators' businesses, Mr. Philossaint was paid kickbacks of approximately 10 percent of the loans' values via checks and wire transfers. (DE 32:9) Mr. Philossaint and his co-defendants/co-conspirators later submitted, and caused the submission of, false and fraudulent applications for PPP loan forgiveness. (DE 32:9).

The indictment further alleged that as a result of the false and fraudulent representations that Mr. Philossaint and his co-defendants/co-conspirators made in the PPP and EIDL loan applications, financial institutions and the SBA disbursed loan proceeds to defendants and co-conspirators in the amount of approximately 8.1 million. (DE 32:9).

As to Count 2, Conspiracy to Commit Money Laundering, Mr. Philossaint and his three co-defendants were charged with conspiring to conduct a financial transaction that involved the proceeds of unlawful activity, with the transaction designed to conceal the nature of proceeds.

As to Count 3, Conspiracy to Commit Money Laundering, the indictment alleged that Mr. Philossaint, and co-defendant, Mariel

Tollinchi, knowingly conspired to transfer funds of more than $10,000 from inside the U.S. to a place outside the U.S., knowing the funds were derived from unlawful activity.

Regarding Count 4, Obtaining Citizenship by Fraud, the indictment alleged that beginning as early as December 15, 2020, and continuing through on or about February 9, 2021, Mr. Philossaint knowingly procured and attempted to procure, contrary to law, naturalization as a United States citizen by falsely swearing to statements in his N-400 (Application for Naturalization), his naturalization interview, and his written Form N-455 (Notice of Naturalization Oath Ceremony), that he had not knowingly committed a crime or offense for which he had not been arrested and that he had not made any misrepresentation to obtain any public benefit in the United States. (DE 32:11-12). The indictment alleged that Mr. Philossaint, at that time, was aware he had committed the offenses of wire fraud conspiracy and money laundering conspiracy, as charged in Counts 1 through 3. (DE 32:12).

The indictment included forfeiture allegations as to all defendants, noticing that upon conviction of Counts 1,2, or 3, the defendants would

be required to forfeit any property directly or indirectly derived from those offenses. (DE 32:12).

On October 20, 2022, a Superseding Indictment was filed adding a fifth defendant, Maurice Shazier.[3] (DE 58).

On November 14, 2022, Mr. Philossaint pled guilty to Counts 1-3 of the Superseding Indictment. (DE 159:7). The parties agreed that the following statement of facts provided a factual basis for Mr. Philossaint's guilty plea:[4]

> Beginning no later than in or around May or June 2020 and continuing through no earlier than in or around June 2021, Philossaint assisted numerous conspirators to submit fraudulent applications for PPP loans and EIDLs on behalf of businesses owned and controlled by the conspirators. At first, Philossaint carried out this scheme while working for Company 1, which was operated by Conspirator 1. Later, Philossaint began working for himself and carrying out the same scheme.
>
> Philossaint prepared loan applications for the conspirator business owners and caused the applications to be sent to his conspirators to digitally sign and electronically submit to various financial institutions and the Small

---

[3] Maurice Shazier, listed as a co-conspirator in the original Indictment (DE 32), was named as a co-defendant in the Superseding Indictment (DE 58).

[4] Mr. Philossaint, his attorney at the time, Ian Goldstein, and the government, signed a factual proffer (DE 94). There was no written plea agreement.

Business Administration ("SBA"). The applications contained material misrepresentations about the businesses, such as substantial overstatements of the businesses' gross revenues, number of employees, and average monthly payroll. Based on these fraudulent applications, various private financial institutions and SBA loaned money, generally hundreds of thousands of dollars, to the conspirators' businesses. Philossaint later prepared applications on behalf of the conspirator businesses for forgiveness of the PPP loans. These applications falsely stated that the businesses had met the preconditions of loan forgiveness by using the loans to pay payroll and/or for other permissible expenses.

Automatic Data Processing, Inc. ("ADP") provided payroll and other services to businesses. Conspirator 1 and/or Philossaint opened ADP accounts on behalf of their conspirators, with themselves (Conspirator 1 or Philossaint) as the account administrators. They caused ADP to make payments purportedly for payroll to individuals with the loan proceeds, although these individuals either did not work for the loan recipients or were not entitled to payroll in the amounts paid. Philossaint attempted to obtain and use ADP records to support the applications for loan forgiveness.

Brianna Monique Gayle had previously worked for ADP. During the conspiracy, she worked as an assistant to Philossaint. Records obtained from ADP showed that Gayle, while working for Philossaint, contacted ADP on multiple occasions between May 2021 and April 2022. Gayle contacted ADP to manage payroll accounts enrolled by EIVC, such as adding or removing accounts.

Gayle also contacted ADP to retrieve payroll documents and W-2's for the payroll accounts. Gayle called ADP on January 26, 2022, and conferenced Philossaint into the call. They stated that their entire client list should have been terminated as going out of business and therefore should have

received W-2's for 2021. Gayle continued to make calls to ADP on behalf of the companies enrolled by EIVC to obtain W-2's.

Shortly after the conspirator business owners received their loan proceeds, they paid either Conspirator 1 or Philossaint a fee of approximately 10% of the value of the loans. In many cases, the fee was paid to shell companies that Philossaint controlled, which did no true business, or inaccurate notations were made on the checks or other instruments of payment. These payments were made from and to financial institutions, that is, banks the deposits of which were insured by the Federal Deposit Insurance Corporation.

Philossaint assisted codefendants and conspirators to apply for fraudulent loans and applied for such loans himself. The conspirators applied on behalf of: Gayle, applying as a sole proprietor; Cinda Foundation Inc; DDZ Family Enterprises LLC; Ferro's Entertainment and Production LLC; JREAM Vision TV LLC; One Solution Group LLC; Royal Elite Trans, LLC; Sunrise City Construction Development LLC; Unfold Perception, LLC; and other businesses. Based on these applications, lenders and SBA paid at least $2,020,328.17 in loans to which the conspirators were not entitled. The conspirators who received these loans paid Philossaint approximately 10% of the value of the loans.

The fraudulent PPP loan and EIDL applications involved in the scheme were submitted electronically to servers located outside Florida. Philossaint, Tollinchi, Rene, Gayle, Shazier, Johnson, and most of the other conspirators resided and worked in the Southern District of Florida and submitted their applications from this district.

## Unfold Perception, LLC

The applications for PPP loans submitted by Unfold Perception, LLC are a representative example of the scheme

and conspiracy. Unfold was a Florida limited liability company. It was organized on May 28, 2019. Rene was the sole managing member. Unfold's principal place of business was in West Palm Beach, Florida.

On June 18, 2020, Unfold applied for a PPP loan. The loan application was digitally signed by Rene. The application was electronically transmitted to Celtic Bank's servers, which were located in Utah. The application stated that Unfold had three employees and average monthly payroll of $32,781.66. For the twelve months preceding this application, records of Unfold's bank account reveal that the company had gross revenue of approximately $10,000 and no payroll. A copy of an IRS Form 941 (Employer's Quarterly Tax Returns) was submitted with the application. This form appeared to corroborate the payroll figure on the application. However, Unfold did not submit the form to the IRS. Based on this application, on June 22, 2020, Celtic Bank transferred a PPP loan to Unfold's Wells Fargo bank account in the amount of $81,954.

Trust Alliance Enterprises Inc. ("Trust") was a Florida corporation. It was incorporated on June 15, 2020. Conspirator 1 was the sole officer. On June 25, 2020, Rene signed a check from the Unfold bank account made out to Trust in the amount of $10,654.02.

On June 30, 2020, eight days after Unfold received its PPP loan, a payroll account was created at ADP for Unfold. Conspirator 1 was the primary contact. From July through December 2020, using proceeds of the PPP loan, Unfold paid $49,172.24 in payments purportedly for payroll via ADP, including $29,999.97 to Rene.

On February 22, 2021, Unfold applied for a second PPP loan. The application was electronically transmitted to Celtic Bank's servers, which were located in Utah. The application stated that Unfold had three employees and average monthly

payroll of $32,781. For the twelve months preceding this application, Unfold had gross revenue of approximately $24,000 (not including PPP and EIDL funds) and payroll of approximately $2,300 (not including the ADP payments). A copy of the same IRS Form 941 that had accompanied Unfold 's previous application, which had not been submitted to the IRS, was submitted with the new application. Based on this application, on February 23, 2021, Celtic Bank transferred a PPP loan to Unfold's Wells Fargo bank account in the amount of $81,952.

Dad Money Investment Group, LLC and Elite International Venture Capital, LLC ("EIVC") were Florida limited liability companies. They were both organized on July 6, 2020. Philossaint was the President of Dad Money. Dad Money was EIVC's sole managing member. The companies principal places of business were two different suites in the same office building in Hallandale Beach, Florida.

On March 5, 2021, Rene signed a check from the Unfold Wells Fargo bank account made out to EIVC in the amount of $5,597—somewhat less than 10% of the amount of Unfold's second PPP loan. In the memo line of the check was written the word "accounting."

On May 6, 2021, Unfold opened a new ADP account. Philossaint was the only authorized firm representative listed on the account. From May through August, 2021, using proceeds of the PPP loan, Unfold paid $49,194.05 in payments purportedly for payroll via ADP, including $30,044.28 to Rene. The last payment was made on August 25, 2021.

On August 6, 2021, Rene sent Philossaint a voice recording over WhatsApp. She stated that she was "wondering when is the last date of the payroll so that way I can call them so they can pause it. Please let me know." On August 18, 2021, Rene wrote to Philossaint by WhatsApp, "Please inform me of when the date payroll ends. I believe it

has been six months." Law enforcement agents subsequently recovered these messages from Philossaint's phone.

On May 24, 2021, Unfold applied for forgiveness of its first PPP loan. The application claimed that Unfold had three employees at the time of the application and that Unfold had spent $49,172.24 of the loan on payroll expenses. As a result of Unfold's application, the loan was forgiven.

On September 8, 2021, Unfold applied for forgiveness of its second PPP loan. The application claimed that Unfold had three employees at the time of the application and that Unfold had spent $49,761.07 of the loan on payroll expenses. As a result of Unfold's application, the loan was forgiven.

**Royal Elite Trans**

Royal Elite Trans, LLC was a Florida limited liability company. Philossaint was the sole managing member. Its principal place of business changed several times, but was always in Miami-Dade or Broward County, Florida. Philossaint was the only signatory on Royal Elite Trans's bank accounts.

On April 1, 2020, Royal Elite Trans applied for an EIDL. The application was electronically transmitted to the servers of the Small Business Administration ("SBA"), which were located outside of Florida. The application required Royal Elite Trans to describe its "detailed business activity." The application listed "Limosine [sic] & Transportation." SBA initially declined the application, but Philossaint requested reconsideration of that decision and then administratively appealed it, and the loan was granted. On December 16, 2021, Philossaint electronically signed a Loan Authorization and Agreement with SBA. The agreement included the requirement that "[b]orrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020

and continuing thereafter." On December 21, 2021, SBA transferred an EIDL to Royal Elite Trans' Bank of America checking account in the amount of $289,400. Philossaint is the only signatory on this account.

Royal Elite Trans had not suffered economic injury in 2020. Royal Elite Trans's bank records indicate that the company's gross revenue increased from $136,766.93 in 2019 to $237,755.07 in 2020 (excluding PPP and EIDL funds). The records contain no indications that Royal Elite Trans operated a limousine or similar transportation business and no indications that Royal Elite Trans paid any significant business expenses.

An attorney's Interest on Trust Account ("IOTA") is an interest-bearing trust account used by members of the Florida Bar to hold nominal or short-term funds in trust for a client or third party when it would not be feasible to earn income on the funds for the client or third party. The income on the IOTA account benefits charitable causes designated by the Florida Bar. Tollinchi Law, PA was a Florida corporation engaged in the practice of law. The sole officer was Mariel Tollinchi. Tollinchi was an attorney and was in a romantic relationship with Philossaint. Tollinchi Law maintained an IOTA account at Chase Bank.

On December 22, 2021, two checks were written from the Royal Elite Trans account, one to Tollinchi Law for $34,000 and the other to Tollinchi personally for $6,573.63. On January 5, 2022, $26,371.30 was wired from Royal Elite Trans' Bank of America checking account to Tollinchi Law's IOTA account. On January 6, 2022, Tollinchi Law wired the same sum, $26,371.30, from the same account to an account in the Dominican Republic. The notation associated with the wire read, "Joff Pbilossaint real estate purchase." On January 20, 2022, the same Royal Elite Trans account wired $190,000.00 to the same Tollinchi Law IOTA account. On January 25, 2022, Tollinchi Law wired $200,000 from its

IOTA account to an account in the Dominican Republic. The notation associated with the wire included Joff Philossaint's name and the words, "Real estate." Royal Elite Trans's bank records contain no indication that its business involved real estate transactions before it obtained the EIDL.

Before the EIDL was deposited into Royal Elite Trans' Bank of America account, the balance in the account was $2,039.50. Between the time of the deposit of the EIDL and the wire of January 20, 2022, the account received approximately $31,650 in deposits. Therefore, Royal Elite Trans could not have transferred the funds to Tollinchi described above without the EIDL.

### Financial Institutions

Wells Fargo, Bank of America, and Chase Bank were financial institutions, that is, banks the deposits of which were insured by the Federal Deposit Insurance Corporation.

(DE 94).

On December 15, 2022, a Second Superseding Indictment was filed adding a sixth defendant, Robenson Lauvince, and 33 additional counts. (DE 107). The only outstanding count concerning Mr. Philossaint was Count 4 – Obtaining Citizenship by Fraud.

On February 6, 2023, a jury trial was convened before the Honorable Rodney Smith, District Judge, as to Mr. Philossaint, who had been severed from his co-defendants. (DE 193).

FBI Special Agent Michelle McDaniel and Wonal Jean, the government's forensic accountant, testified as to their investigation into the PPP and EIDL fraud, to which Mr. Philossaint had previously pled guilty. (DE 369). Agent McDaniel, who was present at Mr. Philossaint's plea hearing, read the signed factual proffer to the jury. (DE 369: 117-127).

Walkiria Vancott, an Immigration Services Officer with the United States Citizenship and Immigration Services, testified that her office processes applications for naturalization (DE 369:211). Ms. Vancott processed Mr. Philossaint's Application for Naturalization Form N-400. (DE 369:214). In his application, Mr. Philossaint checked several boxes "No," in response to questions which asked:

> Have you ever committed, assisted in committing, or attempted to commit a crime or offense for which you have not been arrested for.
>
> Have you ever made any misrepresentation to obtain any public benefit in the United States.
>
> Have you ever given any U.S. Government officials any information or documentation that was false, fraudulent or misleading.

(DE 369:214). Mr. Philossaint signed his N-400 application on February 24, 2020. To gain naturalization, Mr. Philossaint was also interviewed by

Ms. Vancott. The interview occurred on December 15, 2020. (DE 369:216-219). The purpose of the interview was, in part, to ensure Mr. Philossaint remained eligible to become a citizen. (DE 369:220). Ms. Vancott reviewed with Mr. Philossaint the answers Mr. Philossaint had given on his N-400 application, and Mr. Philossaint orally confirmed that the answers to these questions remained the same. (DE 369: 221-224). On December 15, 2020, Mr. Philossaint signed and affirmed, in the presence of Ms. Vancott, that the contents of his N-400 and any corrections made were "complete, true, and correct." (DE 369:226). After the interview, a N-445 Form was mailed to Mr. Philossaint notifying him to appear for his naturalization ceremony on February 9, 2021. (DE 369: 226-227). The N-445 Form contained questions which had to be answered prior to naturalizing, asking the applicant to verify whether anything had changed since the last interview date. (DE 369:227). Mr. Philossaint answered "No," to question 3 on the N-445, which asked: "Since your interview, have you committed any crime or offense for which you have not been arrested." (DE 369:229). Ms. Vancott confirmed that had Mr. Philossaint answered "yes" to this question either on his N-400 or N-445, or admitted to having made a false statement to obtain public benefits,

his application would not have been approved and he would not have been naturalized at that time. (DE 369:230).

On February 7, 2023, following deliberations, the jury found Mr. Philossaint guilty of the charge of procuring naturalization contrary to law. (DE 370:32).

On March 16, 2023, the district court granted Mr. Goldstein's Motion to Withdraw to Withdraw as Counsel (DE 211), and appointed undersigned pursuant to the Criminal Justice Act (CJA), to represent Mr. Philossaint. (DE 243).

Following the preparation of a Presentence Investigation Report ("PSI"), the defense filed objections and a motion for a sentence variance with an accompanying memorandum of law. (DE 281, 306, 308). As part of its written objections to the PSI, the government provided a chart detailing the funded EIDL and PPP loans. (DE 303-1). The chart indicated the loan type, loan amount, and recipient of the kickback. (DE 303-1).

On June 21, 2023, the government filed a motion for Preliminary Order of Forfeiture against Mr. Philossaint in the amount of $673,210.93 (DE 307). According to the government, this amount was based on, "the

10% kickbacks Mr. Philossaint received on loans he assisted others on, and the loans Defendant himself had received". (DE 307:14).

A sentencing hearing was held on June 26, 2023 (DE 311). The defense re-alleged all objections made in Mr. Philossaint's filed objections to the PSI. (DE 371). The defense additionally asserted that the amount Mr. Philossaint received in connection with the fraud, that is, the amount he received for the loans applied on behalf of his two companies along with the 10 percent he got from other persons, was approximately $549,000. (DE 371:47-48). The defense explained that this $549,000 figure was calculated from the government's table, included in the government's filed objections to the PSI. (DE 371:48). The defense argued that the table showed Mr. Philossaint received kickbacks from 19 loans, which approximated to $228,000, and that he received another $299,000 and $20,000 from his companies, Royal Elite and One Solution Group, totaling about $549,000. (DE 371:48).

Towards the end of the sentencing hearing, the defense argued with regard to forfeiture:

> MR. SAKIN:   With respect – I know the Court talked about a forfeiture. We believe the forfeiture amount should not exceed $549,133.00 so I know the Government presented to the Court a higher amount. Having reviewed that, and having looked at

the numbers here and based on the paragraph from the Government in their objections as mentioned before, we believe that the Government can prove $549,133.00.

(DE 371:70). The government responded that Mr. Philossaint, having been held as a leader, could be held liable for the entire loss amount of 3.85 million, but instead, they were seeking $673,210.00. (DE 371:70-71). Without making a factual finding as to whether Mr. Philossaint could be held liable for the entire loss amount of 3.85 million, the district court ruled that the forfeiture against Mr. Philossaint would be capped at $673,210.00. (DE 371:71)

After argument from both parties, the district court, after considering the factors under 18 U.S.C. § 3553(a) concluded that Mr. Philossaint's advisory guideline range was 97-121 months; a level 30 (DE 371:61). The district court, considering other similarly situated defendants who had been previously sentenced, the consequences relating to Mr. Philossaint's immigration and deportation issues, the belief that Mr. Philossaint was remorseful, and the statements of all parties and the PSI, sentenced Mr. Philossaint to 50 months as to Counts 1, 2, and 3, and 50 months as to Count 4, all to be served concurrently. (DE 371:64-66). The court also imposed a three-year term of supervised

release, following Mr. Philossaint's release from prison, and ordered Mr. Philossaint to pay restitution in the amount of $3,850,012.34 (DE 371:66-67).

On June 26, 2023, shortly after Mr. Philossaint's sentencing hearing ended, the district court entered an Order granting the government's Motion for Preliminary Order of Forfeiture. (DE 312).

This appeal follows.

## Standards of Review

In reviewing forfeiture orders, the Eleventh Circuit reviews findings of fact for clear error and legal conclusions *de novo*. *United States v. Gladden*, 78 F.4th 1232, 1242 (11th Cir. 2023). The Court will find clear error if, "after reviewing all the evidence, [it is] left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. Alicea*, 875 F.3d 606, 608 (11th Cir. 2017)).

## Summary of the Arguments

The forfeiture money judgment must be vacated, and this case remanded to the district court for recalculation of the forfeiture amount against Mr. Philossaint.

The government sought, and the district court granted, a forfeiture money judgment based on the amount Mr. Philossaint obtained as a result of his role in the conspiracy to fraudulently acquire PPP and EIDL loans. The government claims Mr. Philossaint obtained approximately $673,210.93 from fraudulent loans he received for his own companies along with kickbacks, of approximately 10 percent, paid to him for assisting others with their loans.

Although the methodology utilized to determine the forfeiture was proper, the district court clearly erred in accepting the government's miscalculation of the forfeiture amount. *See United States v. Hoffman-Vaile*, 568 F.3d 1335 (11th Cir. 2009) (vacating forfeiture money judgment and remanding to the district court to correct forfeiture amount where district court used correct methodology but miscalculated the amount of forfeiture). Rather, the true approximate amount of money Mr. Philossaint obtained was $549,226.30.

## ARGUMENTS AND CITATION OF AUTHORITY

**The forfeiture money judgment entered against Mr. Philossaint must be vacated because the district court clearly erred when it adopted the government's miscalculation as the approximate amount of money subject to forfeiture.**

The Court should vacate the forfeiture money judgment entered against Mr. Philossaint in the amount of $673,201.93. This amount was a miscalculation made by the government, and the district court clearly erred when it adopted this mistaken sum.

### A. Forfeiture background

Forfeiture "is meant to punish the defendant by transferring his ill-gotten gains to the United States Department of Justice." *United States v. Joseph*, 743 F.3d 1350, 1354 (11th Cir. 2014) (internal citations omitted). Restitution and forfeiture serve different goals. *United States v.* Moss, 34 F.4th 1176, 1194 (11th Cir. 2022). The focus of restitution is on the victim, whereas forfeiture is a punitive action focused on the defendant. *Id.*

Upon conviction of an offense in violation of 18 U.S.C. § 1956, a defendant is required to forfeit to the United States "any property, real or personal, involved in such offense, or any property traceable to such

property." 18 U.S.C. § 982(a)(1). A defendant who is convicted of conspiracy to commit wire-fraud must forfeit to the United States, "any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation. 18 U.S.C. § 982(a)(2). Forfeiture sought pursuant to 18 U.S.C. § 982(a) must be proven by a preponderance of the evidence. *United States v. Hasson*, 333 F.3d 1264, 1277-78 (11th Cir. 2003). If the district court finds that property is subject to forfeiture, the district court:

> . . must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria. The court must enter the order without regard to any third party's interest in the property. Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c).

Fed. R. Crim. P. 32.2(b)(2)(A).

If the government seeks a personal money judgment, the court must determine the amount of money the defendant will be ordered to pay. Fed. R. Crim. P. 32.2(b)(1)(A). This determination may be based on evidence already in the record and any additional evidence submitted by the parties and accepted by the court as relevant and reliable. Fed. R.

Crim. P. 32.2(b)(1)(B). Like restitution, the calculation of the forfeiture amount is not an exact science. *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011). The court does not need to establish loss with precision; a reasonable estimate based on available information is sufficient. *Id.*

### B. The approximate amount of money subject to forfeiture against Mr. Philossaint is $549,226.30

In moving for a preliminary order of forfeiture, the government asserted:

> Based on the record in this case, the total value of the proceeds traceable to the offenses of conviction is $673, 210.934 [sic], which may be sought as a forfeiture money judgment pursuant to Rule 32.2 of the Federal of Criminal Procedure.

(DE 307:14). The government explained this amount Mr. Philossaint obtained was based on: the loan funded for One Solution Group, LLC in the amount of $20,833, the loans Mr. Philossaint received from Royal Elite Trans, LLC, totaling $299,400, and the 10 percent kickbacks Mr. Philossaint received in exchange for assisting others with their loans. (DE 307:14). There is no disagreement that Mr. Philossaint is required to forfeit the entire amount of the loans funded for his own companies, One Solution Group and Royal Elite Trans, as well as the 10 percent kickbacks he received for helping others with their loans.

Notwithstanding, the government miscalculated the approximate total of the forfeiture amount, and the district court committed clear error in adopting the government's sum. *See United States v. Hoffman-Vaile*, 568 F.3d 1335 (11th Cir. 2009) (vacating forfeiture money judgment and remanding to the district court to correct forfeiture amount from $705,161.87 to 695,742.96, where district court used correct methodology but miscalculated the amount of forfeiture).

The government's own chart, included in its objections to the PSI, indicates that Mr. Philossaint received kickbacks for 19 of the 33 funded EIDL and PPP loans. (DE 303-1). For the loans in which Mr. Philossaint received kickbacks, he was paid approximately 10 percent of the loans' value. (DE 303-1). Utilizing the values provided in the chart, the total sum of the 19 loans is $2,289,933.01; ten percent is $228,993.30. The computation of $228,993.30, the entire loan amount received by One Solution Group ($20,833) and the entire loan amounts received by Royal Elite (299,400), equates to a total sum of $549,226.30.[5] Although

---

[5] Consistent with the estimate the defense calculated at sentencing. (DE 371: 48,70). Although the defense argued at sentencing that forfeiture should be capped at $549,133.00 (DE 371:70), $549,226.30 is a more precise estimate.

calculating forfeiture is not an exact science, *Treacy*, 639 F.3d at 48, the government's estimate of 673,210 misses the mark by more than $100,000.

When the defense explained at the sentencing hearing how the $549,000 figure was reached, the government, in response, pivoted from its previous argument[6] and countered that Mr. Philossaint, having been found a leader, "could be held liable for the entire loss amount of 3.8 million." (DE 371:70-71). However, the government provided no evidence or support for why Mr. Philossaint could be subject to forfeiture of the entire loss amount of 3.8 million.[7] The district court did not opine or make any factual finding as to whether Mr. Philossaint could be held responsible for the entire loss amount of 3.8 million; it simply accepted

---

[6] The government argued in its Motion for Preliminary Order of Forfeiture that Mr. Philossaint was subject to a forfeiture amount reflecting what he obtained as a result of his role in the conspiracy; 673,210.93. (DE 307:13). As explained herein, the methodology the government used to determine this forfeiture amount was proper, however, the total sum was miscalculated.

[7] In moving for forfeiture (DE 307), the government alluded to instances where leaders or "masterminds" of a conspiracy have been held responsible for the entire proceeds of the fraud, yet stopped short of asserting that Mr. Philossaint was responsible for the entire proceeds of the conspiracy. Rather, the government very clearly outlined which proceeds Mr. Philossaint was responsible for. (DE 307:6,14).

the government's figure of $673,210, a miscalculation, as the cap for the forfeiture amount against Mr. Philossaint. (DE 371:70-71). This was clear error.

## Conclusion

Based on the foregoing, Mr. Philossaint's forfeiture money judgment must be vacated and this case remanded to the district court to correct the amount from $673,210.93 to $549,226.30.

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitation and typeface requirements of Fed. R. App. P. 32(a)(7)(B), because it contains 5,623 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Century Schoolbook font.

*/s/ Scott W. Sakin*
**SCOTT W. SAKIN**

## CERTIFICATE OF SERVICE

I HEREBY certify that on the 14th day of November, 2023, the foregoing (Brief) was electronically filed with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day via CM/ECF on Daniel Matzkin, Esq. (AUSA), Appellate Division, United States Attorney's Office, 99 NE 4th Street, Miami, Florida 33132-2111, daniel.matzkin@usdoj.gov.

*/s/ Scott W. Sakin*
**SCOTT W. SAKIN**