IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NO. **23-12273-A**

United States of America,

Appellee,

- versus -

Joff Philossaint,

Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
_____

BRIEF FOR THE UNITED STATES


> Markenzy Lapointe
> United States Attorney
> Attorney for Appellee
> 500 E. Broward Blvd., 7th Floor
> Ft. Lauderdale, Florida 33394
> (954) 660-5948


Daniel Matzkin
Chief, Appellate Division


Robert Juman
Assistant United States Attorney

Of Counsel

**United States v. Joff Philossaint, Case No. 23-12273-A**

**Certificate of Interested Persons**

In compliance with Fed. R. App. P. 26.1 and 11th Circuit Rules 26.1 and 28-1, the undersigned certifies that the list below is a complete list of the persons and entities previously included in the government's CIP, as well as additional persons and entities (designated in bold face) who have an interest in the outcome of this case.

Adler, Robert E.

**Birch, Peter**

**Clayton, Sean**

**Dispoto, Mark**

Finney, Jr., Linnes

**Funk, David**

**Gatz, Lara**

Gayle, Brianna Monique

Goldstein, Ian Jeremy

Gonzalez, Juan Antonio

**Gyires, Marton**

Johnson, David Andre

**Juman, Robert C.**

**United States v. Joff Philossaint, Case No. 23-12273-A**

**Certificate of Interested Persons (Continued)**

Lacosta, Anthony W.

Lapointe, Markenzy

Lauvince, Robenson

Matthewman, Hon. William

Matzkin, Daniel

Maynard, Hon. Shaniek

McCabe, Hon. Ryon M.

**McCrae, Caroline**

McCray, Jr., Johnny Leonard

Michelen, Juan

**Morris, Lothrop**

**O'Shea Darsch, Shannon**

Osborne, Marc

Osborne, Susan

Paster, Joshua

Philossaint, Joff Stenn Wroy

Rabin, Jr., Samuel Joseph

Ralston, Brian

**United States v. Joff Philossaint, Case No. 23-12273-A**

**Certificate of Interested Persons (Continued)**

Reinhart, Hon. Bruce E.

Rene, Regine Marie

**Robberts, Elizabeth**

Sakin, Scott William

Salnick, Gregory Steven

**Schall, Sarah**

Schiller, Gregory

Shazier, Maurice

**Silber, Brian Yaacov**

Small Business Administration (SBA)

Smith, Hon. Rodney

**Sweetapple, Sarah Elizabeth**

Timberlake-Wiley, Deana L.

Tollinchi, Mariel

**Tribuiani, Rinku**

Tucker, David Kalman

Valle, Hon. Alicia O.

Villafana, Ann Marie C.

**United States v. Joff Philossaint, Case No. 23-12273-A**

**Certificate of Interested Persons (Continued)**

Wasserman, Jonathan Harry

**Waugh, Robin**

Weinstein, Michael David

Weiss, Jason Samuel

White, Charles Garret

Wilcox, Daryl Elliott


/s/ *Robert Juman*
Robert Juman
Assistant United States Attorney

**Statement Regarding Oral Argument**

The United States of America respectfully suggests that the briefs and record before this Court adequately present the facts and legal arguments and that oral argument would not significantly aid the decisional process.

# Table of Contents

**Page**:

Certificate of Interested Persons ................................................................. c-1

Statement Regarding Oral Argument .................................................... i

Table of Contents ............................................................................. ii

Table of Citations .......................................................................... iv

Statement of Jurisdiction ................................................................ vii

Statement of the Issue ..................................................................... 1

Statement of the Case:

    1.    Course of Proceedings and Disposition in the Court Below ............ 1

    2.    Statement of the Facts ........................................................... 2

        A.    Scheme to Defraud............................................................ 2

        B.    Facts Established at Trial ................................................... 6

        C.    Pre-Sentence Investigation Report..................................... 7

        D.    Forfeiture Motion............................................................ 9

        E.    Sentencing.................................................................... 11

    3.    Standard of Review ............................................................. 13

Summary of the Argument ............................................................... 13

**Table of Contents**

**(continued)**

**Page:**

Argument and Citations of Authority:

     There was no Clear Error In The Court's Forfeiture Calculation. ............. 14

     A.    Leaders of a conspiracy jointly obtain the proceeds of the

              conspiracy with their co-conspirators ............................................... 14

     B.    Based on his leadership role in the conspiracy, Philossaint was

              liable for the full amount of fraudulent loan proceeds..................... 17

     C.    The district court's forfeiture money judgment understates the

              amount of forfeitable proceeds........................................................... 19

Conclusion  ..................................................................................................... 22

Certificate of Compliance ...................................................................................... 23

Certificate of Service  ........................................................................................... 23

# Table of Citations

**Cases:**                                                                                              **Page:**

*Lucas v. W.W. Grainger, Inc.*,

   257 F.3d 1249 (11th Cir. 2001)...............................................................19

*United States v. Alicea*,

   875 F.3d 606 (11th Cir. 2017).................................................................13

*United States v. Bane*,

   948 F.3d 1290 (11th Cir. 2020)...............................................................15

*United States v. Bergstein*,

   788 F. App'x 742 (2d Cir. 2019) ..........................................................16

*United States v. Cingari*,

   952 F.3d 1301 (11th Cir. 2020)...............................................................15

*United States v. Elbeblawy*,

   839 F. App'x 398 (11th Cir. 2021) ..........................................................9

*United States v. Goldstein*,

   989 F.3d 1178 (11th Cir. 2021)...............................................................13

*United States v. Honeycutt*,

   581 U.S. 443 (2017) .............................................................. 13, *passim*

*United States v. Knowles*,

   819 F. App'x 781 (11th Cir. July 2, 2020)............................................15

**Table of Citations**

**(Continued)**

<u>**Cases**</u>:                                                                                   <u>**Page**</u>:

*United States v. Lamin*,

   2022 WL 16757925 (4th Cir. Nov. 8, 2022)...........................................18

*United States v. Leyva*,

   916 F.3d 14 (D.C. Cir. 2019) ..................................................................16

*United States v. Mazkouri*,

   945 F.3d 293 (5th Cir. 2019)............................................................ 20, 21

*United States v. Saccoccia*,

   955 F.3d 171 (1st Cir. 2020) ..................................................................16

*United States v. Straub*,

   508 F.3d 1003 (11th Cir. 2007)................................................................2

*United States v. Treacy,*

   639 F.3d 32 (2d Cir. 2011).....................................................................19

*United States v. Uddin*,

   551 F.3d 176 (2d Cir. 2009)...................................................................19

**Statutes & Other Authorities**:                                                    **Page**:

18 U.S.C. § 981 ...............................................................................16

18 U.S.C. § 982 ........................................................................ vii, 9

18 U.S.C. § 1349 .............................................................................1

18 U.S.C. § 1425 .............................................................................1

18 U.S.C. § 1956 .............................................................................1

21 U.S.C. § 853 .............................................................................14

28 U.S.C. § 1291 ......................................................................... vii

Fed. R. App. P. 4 ........................................................................ vii

Fed. R. App. P. 26.1 ................................................................ c 1 of 2

Fed. R. App. P. 32 ........................................................................23

Fed. R. Crim. P. 32.2 .................................................................. vii

**United States Sentencing Guidelines**:                                    **Page**:

§ 3B1.1 .......................................................................................17

**Statement of Jurisdiction**

This is an appeal from a final order of the United States District Court for the Southern District of Florida granting the government's motion for a forfeiture money judgment in a criminal case. The district court had jurisdiction pursuant to 18 U.S.C. § 982(a)(1), (2) and Fed. R. Crim. P. 32.2. The district court entered its order granting the motion on June 26, 2023 (DE312). Joff Stenn Wroy Philossaint filed a timely notice of appeal on July 10, 2023 (DE324); *see* Fed. R. App. P. 4(b). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

**Statement of the Issue**

Philossaint was the organizer and leader of a wire fraud and money laundering scheme that resulted in over $3.8 million in losses. Did the district court clearly err by issuing a forfeiture money judgment against Philossaint for $673,210.934, an amount far less than the fraudulent proceeds for which Philossaint was liable?

**Statement of the Case**

**1.    Course of Proceedings and Disposition in the Court Below**

A Superseding Indictment charged Philossaint and others with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349 (Count One) and Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h) (Counts Two and Three). Philossaint was also charged with Obtaining Citizenship by Fraud, in violation of 18 U.S.C. § 1425(a) (Count Four) (DE58).

Philossaint pleaded guilty to Counts One, Two and Three without an agreement and proceeded to trial on Count Four (DE93). Prior to trial, the government filed a Second Superseding Indictment removing Philossaint from Counts One, Two and Three, and restating Count Four against Philossaint (DE107).

After trial, Philossaint was convicted on Count Four of the Second Superseding Indictment (DE198).

The district court sentenced Philossaint to 50 months of imprisonment, below the advisory guideline range, followed by three years of supervised release,

restitution of $3,850,012, and a $400 special assessment (DE314). In addition, the district court ordered forfeiture in the amount of $673,210.934 (DE312:10).

**2.    Statement of the Facts**

**A.    Scheme To Defraud**

In connection with his guilty plea to Counts One, Two and Three of the Superseding Indictment, Philossaint agreed to a factual proffer, which incorporated by reference paragraphs One through Nine of the Superseding Indictment (DE58), and acknowledged that "the government may present evidence at future proceedings that his criminal conduct was more extensive than is described in this proffer" (DE94:1). The facts below come from Philossaint's factual proffer, as well as undisputed[1] findings in the pretrial services report ("PSI"):

**The Loan Programs**

The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic (DE58:1). One source of relief provided by the CARES Act was the

---

[1] Philossaint raised a general objection to the PSI that he "disputes facts that are contrary, or in addition, to those contained in the factual proffer (DE281:2 n. 2). This general objection, which identifies no specific facts or explains why they were false, is insufficient. *See United States v. Straub*, 508 F.3d 1003, 1011 (11th Cir. 2007) (explaining to preserve an issue for appeal, one must raise an objection that is sufficient to apprise the trial court and the opposing party of the particular grounds upon which appellate relief will later be sought).

2

authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program known as the Paycheck Protection Program ("PPP") (DE58:1-2). In order to obtain a PPP loan, a qualifying business submitted a loan application online to the Small Business Administration ("SBA") (DE58:2). This application had to, among other things, certify that the business was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes (DE58:2). In addition, businesses applying for the PPP loan had to provide documentation confirming their payroll expenses, typically documents showing the amount of payroll taxes reported to the IRS (DE58:2). These figures and documentation were used to calculate the amount of money the small business was eligible to receive under the PPP (DE58:2). The PPP allowed the interest and principal on the PPP loan to be forgiven if the business spent the loan proceeds on these expense items within a designated time and used a defined portion of the PPP loan proceeds on payroll expenses (DE58:3).

Before the pandemic, the SBA's Economic Injury Disaster Loan ("EIDL") program provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters (DE58:3). The CARES Act also authorized the SBA to provide EIDL assistance to eligible small businesses experiencing "substantial economic injury" due to the COVID- 19 pandemic (DE58:3). In order to obtain a COVID-19 EIDL, a qualifying business had to submit

3

electronically an EIDL application to the SBA and provide information about its operations, such as the number of employees, gross revenues, and the cost of goods sold for the 12-month period preceding January 31, 2020 (DE58:3). The applicant was also required to certify under penalty of perjury that all the information in the EIDL application was true and correct to the best of the applicant's knowledge (DE58:3).

### **Philossaint's Offense Conduct**

Philossaint assisted numerous conspirators to submit fraudulent applications for PPP loans and EIDLs on behalf of businesses owned and controlled by his conspirators (DE94:1). At first, Philossaint carried out this scheme while working for Company 1, which was operated by Conspirator 1, but later carried out the scheme while working for himself (DE94:1-2).

Philossaint prepared the loan applications and caused them to be sent to his conspirators to sign and submit (DE94:2). These applications contained material misrepresentations, such as substantial overstatements of the businesses' gross revenues, number of employees, and average monthly payroll (DE94:2). Based on these fraudulent applications, private lenders and SBA loaned money to the businesses (DE94:2; PSI ¶ 17).

Philossaint later prepared applications on behalf of the conspirator businesses for forgiveness of the PPP loans (DE94:2). These applications falsely stated that the

4

businesses had met the preconditions of loan forgiveness by using the loans to pay payroll or for other permissible expenses (DE94:2). In furtherance of this part of the scheme, Philossaint opened payroll processing accounts with Automatic Data Processing, Inc. ("ADP") (DE94:2). Philossaint served as the primary contact and account administrator, and, using the fraudulent loan proceeds, caused ADP to make purported payroll payments (DE94:2; PSI ¶ 19). But before the receipt of the fraudulent loans, these business either had not employed the purported employees at all or had done so on a much more limited basis (DE94:2; PSI ¶19). Philossaint sought to use the ADP records to support the loan forgiveness applications (DE94:2). Another conspirator, Brianna Monique Gayle, worked as an assistant to Philossaint and helped him manage and obtain documentation from ADP payroll accounts (DE94:2-3).

Philossaint also submitted three fraudulent loan applications on behalf of his own companies (Dad Money Investment Group, One Solution Group, LLC, and Royal Elite Trans, LLC) (DE94:6-8, DE303-1:2; PSI ¶ 21). These applications resulted in actual payments of $320,233 (PSI ¶ 24).

In total Philossaint and his conspirators were responsible for at least 40 fraudulent loans, which sought $5,205,654.01 in loans, and resulted in an actual loss of $3,850,012.34 (PSI ¶ 24).

**Kickback Payments**

In his factual proffer, Philossaint agreed that "[s]hortly after the conspirator business owners received their loan proceeds, they paid either Conspirator 1 or Philossaint a fee of approximately 10% of the value of the loans" (DE94:3). By the time of sentencing, the government had clarified that out of 33 funded loans, Philossaint had received kickbacks on only 19 of the fraudulent loans (DE303-1:2). The government listed the 33 funded loans, noting that Philossaint was paid kickbacks on 19 of the loans and that a co-conspirator was paid a kickback on four of the loans (DE303-1:1-2). As for the remaining 10 loans, two had been received by Philossaint's own companies, so there was no reason to expect a kickback to be paid to Philossaint (DE303-1:2). Of the remaining eight loans, the government was unaware of whether or not there had been a kickback (DE303-1:1-2).[2]

This correction was acknowledged by probation and incorporated in the second addendum to the PSI (DE308-2:2-3).

**B.    Facts Established at Trial**

At trial on Count Four of the Second Superseding Indictment, the government established that in 2020, Philossaint, a native of Haiti, applied for naturalization as a United States citizen. In connection with his application, Philossaint submitted

---

[2] In a separate filing, the government noted that Philossaint prepared eight loan applications for his fiancée, Mariel Tollinchi, which accounted for $257,867 of the total loss (DE309:7-8).

various forms to the United States Citizenship and Immigration Service ("USCIS") and was interviewed by a USCIS officer (DE369:213-31; GX46-47). On these forms and in this interview, Philossaint falsely certified that he had never committed a crime, had never made a misrepresentation to obtain a public benefit, and had never given fraudulent or misleading information to a government official (DE369:213-29; GX45-47).

These statements were false because Philossaint had committed a crime—the fraudulent scheme underlying Counts One, Two and Three of the Superseding Indictment (DE369:116, GX50). The government introduced a chart listing 23 of the fraudulent loans involved in the scheme, three of which were not funded, which resulted in fraudulent payments of $2,514,377.67 (DE204-1).

Had Philossaint admitted to this conduct on his USCIS forms and interview, his application for naturalization would have been denied (DE369:229-31).

### C.    Pre-Sentence Investigation Report

The PSI used the intended loss amount of $5,205,654.01 to calculate Philossaint's offense level (PSI ¶ 90). The PSI determined that Philossaint deserved a four-level enhancement to his offense level because he was an organizer or leader (PSI ¶ 94). The PSI noted that Philossaint received much of the loan proceeds for preparing and filing the loan applications, that Philossaint was the designated contact

for each ADP account, and that Philossaint controlled the transfer of the funds to help conceal the criminal conduct (PSI ¶ 77).

Based on a total offense level of 35 and a criminal history category of I, Philossaint's advisory sentencing range was 168 to 210 months (PSI ¶ 157).

Philossaint objected to the PSI's loss calculations (DE281). Philossaint claimed that the loss should be limited to either $2,020.328.17, the actual loss amount listed in Philossaint's factual proffer, or $2,514,377.67, the actual loss amount listed in a trial exhibit used during Philossaint's trial on Count Four (DE281:11). Philossaint also objected to any role adjustment, claiming that "he was not an organizer or leader" (DE281:12).

In response to Philossaint's objections, the government noted that the factual proffer did not purport to limit the amount of loss caused by Philossaint's scheme, and that it used the phrase "at least $2,020,328.17" to indicate that the actual loss could be higher (DE304:3). The government pointed out that "no trial evidence or testimony suggested that these figures represented the total of all fraudulent loans submitted by the conspirators" (DE304:3). The government argued that the PSI properly applied a four-level role adjustment because Philossaint was an organizer or leader of the conspiracy (DE304:5). The government noted that after the conspirators received fraudulent PPP loans, Philossaint opened payroll accounts with ADP, and used the loan proceeds to pay purported payroll for six months to

qualify the conspirators for forgiveness of their loans (DE304:6). The recipients of the supposed payroll payments were not actually employees of the conspirators' businesses, and Philossaint was the administrator for these ADP accounts (DE304:6). The government argued that the fact that so many conspirators gave Philossaint control over their payroll accounts, and that so many made kickback payments to him through shell companies, demonstrated that he at least coordinated and organized the money laundering (DE304:7). The government also noted that Philossaint directly supervised Gayle, his employee, in the scheme (DE304:7). All of this evidence demonstrated that Philossaint was entitled to a four-level role adjustment (DE304:7).

### D.    Forfeiture Motion

Prior to sentencing, the government moved for the entry of a preliminary order of forfeiture against Philossaint in the amount of $673,210.934 (DE307). The government argued that any property that constitutes or derives from proceeds traceable to the commission of a wire-fraud offense or a money laundering transaction, is subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1), (2) (DE307:3-4). The government further argued that "conspiracy leaders or 'masterminds' who control criminal enterprises jointly acquire the proceeds of the conspiracy with their co-conspirators." (DE307:6) (citing *United States v. Elbeblawy*, 839 F. App'x 398, 400 (11th Cir. 2021).

9

The government then pointed out undisputed facts in the PSI, derived from Philossaint's factual proffer, establishing Philossaint was a conspiracy leader (DE307:7). The government noted that Philossaint assisted many conspirators to submit fraudulent applications for PPP loans and EIDLs, at first while working for Company 1, and later working for himself and carrying out the same scheme (DE307:7). Philossaint himself prepared the fraudulent loan applications and caused them to be sent to his co-conspirators to be digitally signed and submitted (DE307:8). Philossaint later prepared fraudulent applications for forgiveness of the loans, based on a claim that the conspirators had used the loans for payroll or other permissible expenses (DE307:8). In reality, Philossaint opened ADP accounts for the co-conspirators and caused ADP to make purported payroll payments to people who had no right to any such payments, merely to create records that could be used to support the applications for loan forgiveness (DE307:8). Philossaint also supervised his assistant, Gayle, who contacted ADP to manage these payroll accounts (DE307:8).

Though having argued that as a "mastermind," Philossaint was responsible for the entire proceeds of the fraud (DE307:6), the government did not seek the full $3,850,012.34 generated by Philossaint's fraudulent scheme. Instead, it tried to make a "reasonable estimate" of a forfeiture amount (DE307:14).

10

The government noted that Philossaint submitted fraudulent loan applications on his own behalf for three companies, resulting in the receipt of $320,233 (DE307:14). To this amount, the government added 10% of the remaining fraudulent loan payments, to reflect the fact that Philossaint generally received a 10% kickback from his co-conspirators (DE307:14). [3] Subtracting $320,233 from the total fraudulent loans paid of $3,850,012.34, resulted in a subtotal of $3,529,779.34. Ten percent of this subtotal equaled $352.977.934, and adding this amount to the $320,233 in directly received loan proceeds resulted in a figure of $673,210.934 (DE307:14). Based on these calculations, the government sought a forfeiture money judgment of $673,210.934 (DE307:14).

### E.    Sentencing

At sentencing, the district court first addressed Philossaint's objections to the PSI (DE371:3).

With respect to Philossaint's objections to the amount of actual loss, Philossaint agreed that government could prove the $3.8 million loss amount figure in the PSI (DE371:14-15). Philossaint asked the court to consider that this number was higher than the numbers agreed to in the factual proffer and established during the trial (DE371:15).

---

[3] The government failed to repeat the clarification it made in its objections to the PSI that Philossaint did not receive a kickback on every loan (DE303-1:2).

The district court overruled Philossaint's objection to a role enhancement, finding there was sufficient evidence to support a two-level leadership role adjustment (DE371:29, 54, 60).

When arguing for an appropriate sentence, Philossaint again agreed that the amount of actual loss caused by the fraud was $3.8 million (DE371:47). Still, Philossaint argued that the amount he personally received was only about $549,000 (DE371:47). Philossaint based this calculation on the government's objections to the PSI (DE303-1), which had clarified that Philossaint received kickbacks from 19 loans, not from every loan (DE371:48).[4] Philossaint agreed that he received about $320,000 directly, and represented that adding 10% of the value of the 19 loans on which he received kickbacks resulted in a total of about $549,000 (DE371:48).

After resolving Philossaint's objections, the court imposed a sentence of 50 months of incarceration, reflecting a significant downward variance from the applicable guideline range (DE371:66).

After the court stated that it would order forfeiture, Philossaint asked that the forfeiture amount to be no more than $549,133, referring to his previous calculation of money that he personally received (DE371:70). The government responded that

---

[4] Though the district court stated at the start of the sentencing that it had not received this document (DE371:7-8), Philossaint still relied on it at sentencing, and its substance was contained in the second addendum to the PSI, which the court stated it had considered (DE371:66).

Philossaint had been found to be a leader of the scheme, and that he therefore could be held liable for the entire $3.8 million loss (DE371:70-71). The government noted that its request for $673,210 was "far below" what Philossaint could be held liable for (DE371:71). The court ruled that forfeiture would be $673,210 (DE371:71) and issued a written order for a forfeiture money judgment of $673,210.934 against Philossaint (DE312).

**3.    Standard of Review**

In reviewing forfeiture orders, the Court reviews "findings of fact for clear error and legal conclusions de novo." *United States v. Goldstein*, 989 F.3d 1178, 1202 (11th Cir. 2021). The Court will find a clear error only if, "after reviewing all the evidence," the Court is "left with the definite and firm conviction that a mistake has been committed." *United States v. Alicea*, 875 F.3d 606, 608 (11th Cir. 2017).

## Summary of the Argument

*United States v. Honeycutt,* 581 U.S. 443 (2017), and its progeny make clear that leaders of a conspiracy jointly obtain the proceeds of a conspiracy with their coconspirators. The court could have issued a forfeiture money judgment for the full amount of the fraud—over $3.8 million. Instead, the district court issued a much more conservative judgment—less than 20% of the full amount—based on a reasonable estimate calculated by combining the fraudulent loan proceeds paid directly to Philossaint and 10% of the remaining fraudulent loans, reflecting the fact

13

that Philossaint generally, though not always, received a 10% kickback from co-conspirators on the remaining loans. Because the court's forfeiture money judgment underestimates the amount for which Philossaint could have been held liable, there was no clear error in the court's calculation.

Argument

**There was no Clear Error In The Court's Forfeiture Calculation.**

Philossaint claims that the district court erred in calculating his $673,210.934 forfeiture money judgment. He argues that the "true approximate amount of money [he] obtained was $549,226.30" (Br. 31). But Philossaint's argument overlooks the fact that, as a leader of the conspiracy, Philossaint was liable for over $3.8 million in restitution. Thus, if anything, the district court's forfeiture judgment vastly understated the amount of forfeiture owed, and there was no clear error in the court's calculation.

**A.    Leaders of a conspiracy jointly obtain the proceeds of the conspiracy with their co-conspirators.**

In *United States v. Honeycutt*, 581 U.S. 443 (2017), the Supreme Court held that 21 U.S.C. § 853 limited "forfeiture to tainted property acquired or used by the defendant," and consequently "foreclose[d] joint and several liability for co-conspirators." 581 U.S. at 450. The defendant there was a salaried employee of a store selling a product known to be used to manufacture methamphetamine. 581 U.S. at 445-47. He had "no controlling interest in the store," "did not stand to benefit

14

personally" from the sales, and did not control the proceeds of the offense. 581 U.S. at 446. The defendant-employee thus "never obtained tainted property as a result of the crime," a requirement for forfeiture under § 853. 581 U.S. at 454.

As relevant here, however, the Supreme Court distinguished the defendant in *Honeycutt* from "mastermind" conspirators, who obtain property both directly *and indirectly* through intermediaries. *See Honeycutt*, 581 U.S. at 450 ("mastermind" defendant can "obtain" drug payments under § 853(a)(1) directly from purchasers, or indirectly via use of an intermediary). Accordingly, this Court has found that, under *Honeycutt,* conspiracy leaders who control criminal enterprises jointly acquire the proceeds of the conspiracy with their coconspirators. *See United States v. Cingari*, 952 F.3d 1301, 1305-06 (11th Cir. 2020) (finding that because husband and wife defendants jointly owned the business that profited from the fraud, they were both liable for a forfeiture money judgment in the amount of the proceeds generated by the business they owned); *United States v. Knowles*, 819 F. App'x 781,   783, n.1 (11th Cir. July 2, 2020) ("Knowles was a 'leader' with decision-making authority and a high degree of participation in the drug conspiracy. Knowles therefore directly or indirectly 'obtained' $13.9 million in proceeds from the drug conspiracy himself, and thus, unlike in *Honeycutt*, those proceeds were directly forfeitable under § 853(a).") (internal citations omitted); *United States v. Bane*, 948 F.3d 1290, 1297-98 (11th Cir. 2020) (finding that defendant failed to prove under *Honeycutt* that he

was not liable for the full proceeds of the conspiracy because he was the owner of the two companies that obtained the fraud proceeds and "the mastermind behind the fraud").

Every other Circuit to have addressed *Honeycutt*'s applicability to leaders and organizers of conspiracies has similarly found that conspiracy leaders jointly obtain proceeds of the conspiracy with their coconspirators. *See, e.g.*, *United States v. Leyva*, 916 F.3d 14, 30 (D.C. Cir. 2019) (affirming entry of a $529.2 million money judgment for the leader of a drug-trafficking conspiracy because *Honeycutt* did not involve the leader of a conspiracy and thus does not stand for a proposition that the leader of a conspiracy does not obtain "directly or indirectly" the property acquired by the criminal organization); *United States v. Bergstein*, 788 F. App'x 742, 748 (2d Cir. 2019) ("For the purposes of forfeiture under 18 U.S.C. § 981(a)(1)(C), 'acquired' property need not be personally or directly in the possession of the defendant as long as at some point, it had been under the defendant's control.") (internal citations omitted); *United States v. Saccoccia*, 955 F.3d 171, 175 (1st Cir. 2020) ("[W]e agree with many of our sister courts' conclusions that where a defendant controlled the full proceeds as a result of the crime, *Honeycutt* does not preclude him from being held liable for the value of such funds.").

Thus, conspiracy leaders remain subject to forfeiture liability for any tainted property obtained by their co-conspirators. *Honeycutt*, 137 S. Ct. at 1633.

**B.    Based on his leadership role in the conspiracy, Philossaint was liable for the full amount of fraudulent loan proceeds**

Philossaint does not contest the district court's finding that he was an organizer and leader of the fraudulent scheme and that a two-level aggravating role adjustment under USSG § 3B1.1(c) was appropriate (DE371:60). And the record amply supported this finding. As Philossaint admitted in his factual proffer, he prepared loan applications for the conspirator business owners and caused the applications to be digitally signed and submitted to the fraud victims (DE94:2). Philossaint was therefore personally responsible for the "material misrepresentations" about the businesses, such as substantial overstatements of their gross revenues, number of employees, and average monthly payroll (DE94:2). But for Philossaint's actions, the fraudulent loan applications would never have been submitted. He was thus directly responsible for the amounts paid by the victims to him and his co-conspirators, and under *Honeycutt*, as a leader of the scheme, Philossaint jointly acquired the proceeds of the conspiracy with their coconspirators. And in the case of the loans to Royal Elite Trans and One Solution Group, Philossaint controlled the recipient businesses, so was obviously in control of the fraudulent loan payments.

And Philossaint's leadership role did not end once the fraudulent loan payments were made. He was also integral to the money laundering scheme in which fraudulent loan payments were cycled through ADP to create the illusion that payroll

17

payments were being made. So Philossaint did not simply indirectly acquire these funds through his leadership in the conspiracy; he acquired them directly by taking control of them and using them to perpetuate the scheme. *See United States v. Lamin*, 2022 WL 16757925, *2 (4th Cir. Nov. 8, 2022) (defendant who deposited fraudulently obtained money orders into various bank accounts "acquired" or "came into possession" of those funds). In connection with that part of the scheme, Philossaint opened ADP accounts for the conspirator businesses and, as administrator of the ADP accounts, took control of the fraudulent loan proceeds, using them to make fake payroll payments, thus making the forgiveness applications appear legitimate (DE94:2).

As Philossaint conceded at sentencing, and does not dispute on appeal, the total amount of fraudulent loan proceeds was over $3.8 million (DE295 ¶¶ 24, 166; DE371:15). The district court could therefore have ordered forfeiture of the full $3.8 million.

On appeal, Philossaint claims that at the time of sentencing "the government provided no evidence or support for why Mr. Philossaint could be subject to forfeiture of the entire loss amount of 3.8 million" (Br. 36). Not so. As the government made clear in its motion for forfeiture and during the sentencing hearing, once the court determined that Philossaint was a leader of the scheme, under *Honeycutt*, he could be held liable for the entire loss amount (DE307:6, 371:70-71).

18

And in response to Philossaint's sentencing memorandum, the government argued specifically that the losses were far more than "reasonably foreseeable" to Philossaint because "[h]e was the primary orchestrator of those losses" (DE309:7). In any event, no matter what the government argued below, the record is clear that Philossaint was a leader of the conspiracy and thus liable for the full amount of the loss, and this Court may affirm the district court on any ground supported by the record. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001)

### C. The district court's forfeiture money judgment understates the amount of forfeitable proceeds.

Because the "calculation of forfeiture amounts is not an exact science," the "court 'need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information.'" *United States v. Treacy,* 639 F.3d 32, 49 (2d Cir. 2011) (quoting *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)). Therefore, a court "may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding" *Treacy*, 639 F.3d at 49 (citing *Uddin*, 551 F.3d at 180). The court determined that the $549,133 amount proposed by Philossaint was too low and that the government's proposal of $673,210.934 was more appropriate (DE371:70-71). This decision was not clearly erroneous.

Philossaint argues that the district court erred in calculating the $673,210.934 forfeiture amount because it based this calculation on the premise that Philossaint

19

received a 10% kickback on every funded loan when Philossaint received kickbacks on only 19 of the loans (Br. 35). The government agrees it was only able to establish that Philossaint received kickbacks on 19 of the loans—indeed, the government advised the court of this fact in its objections to the PSI (DE303-1). Thus, the district court's forfeiture order is incorrect when it states that the $673,210.934 amount is based on Philossaint receiving kickbacks on more than 19 loans (DE312:10). But as the government noted at the sentencing hearing, the $673,210.934 the government sought in its forfeiture motion was far less than the $3.8 million Philossaint could have been held liable for (DE371:70-71).

Here, because the court's forfeiture amount is significantly lower than the $3.8 million which could have been ordered, any error in the court's calculation was not clearly erroneous. *United States v. Mazkouri*, 945 F.3d 293 (5th Cir. 2019), is instructive. In *Mazkouri*, the defendant engaged in health care fraud resulting in actual loss to Medicare of almost $23 million. *Id.* at 306. In connection with forfeiture, the government's sentencing memorandum noted that the defendant admitted to personally receiving $2,421,604 from certain Medicare claims. *Id.* at 307. The government then conducted its own calculation to confirm that number, and arrived at a "conservative measure" of $1,126,775.46. *Id.* The defendant's sentencing memo claimed that he received only $892,155. *Id.* At sentencing, the district court ordered a forfeiture money judgment of $500,000, without elaborating

20

on its method for calculating that figure. *Id.* at 306-07. On appeal, the Fifth Circuit determined that the $500,000 order was "if anything, an understatement" of the amount the defendant personally gained. *Id.* at 307. Noting the cases from multiple circuits upholding "reasonable estimates for calculating criminal forfeiture," the Fifth Circuit held that the district court had not clearly erred in its forfeiture calculation. As in *Mazkouri*, the forfeiture money judgment against Philossaint was an understatement of the amount Philossaint was personally responsible for. Accordingly, as in *Maskouri*, the district court did not clearly error in its forfeiture calculation.

**Conclusion**

For the foregoing reasons, the district court's decision should be affirmed.

Respectfully submitted,

Markenzy Lapointe
United States Attorney

By:    /s/ *Robert Juman*
Robert Juman
Assistant United States Attorney
500 E. Boward Blvd., 7th Floor
Ft. Lauderdale, FL 33394
(954) 660-5948
Robert.Juman@usdoj.gov

Daniel Matzkin
Chief, Appellate Division

Of Counsel

22

## Certificate of Compliance

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements for Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, 14-point Times New Roman font.

## Certificate of Service

I hereby certify that four copies of the foregoing Brief for the United States were mailed to the Court of Appeals via Federal Express this 11th day of December 2023, and that, on the same day, the foregoing brief was filed using CM/ECF and served via CM/ECF on Scott William Sakin, Esq. counsel for Joff Philossaint.

/s/ *Robert Juman*
Robert Juman
Assistant United States Attorney

*jp*

23